PEARSON, J.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| NC LAFONSE PRYOR, | ) | |
| | ) | CASE NO. 4:23-CV-2259 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| ANNETTE CHAMBERS-SMITH, et al., | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

*Pro se* Plaintiff NC LaFonse Pryor filed this action against Ohio Department of Rehabilitation and Correction ("ODRC") Director Annette Chambers-Smith and sixteen officials at the Trumbull Correctional Institution ("TCI"). Plaintiff was found guilty of numerous conduct violations and sent to limited privileges housing ("LPH"). He alleges he attends services and programming for multiple religions while in the general population. He contends his attendance at all but his designated religion were denied while he was in LPH. He asserts claims under the First Amendment for freedom of religion and retaliation, the Eighth Amendment for harassment, and under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). He also alleges that the Defendants retaliated against him and harassed him for behaving in a sexually inappropriate manner toward female corrections officers. He asserts claims under the First and Eighth Amendments. He seeks monetary damages.

(4:23cv2259)

## I. Background

Plaintiff is currently incarcerated in the Toledo Correctional Institution ("ToCI"), serving a 54 year sentence for kidnaping, rape, felonious assault, and failure to notify change of address. Prior to his transfer to ToCI on August 8, 2023, Plaintiff was incarcerated in the Trumbull Correctional Institution ("TCI"). The events described in his Complaint pertain to his time in TCI.

Plaintiff claims he entered TCI the week of June 20, 2022. He states that he is classified as Muslim, and attends all Muslim services and Muslim based classes and programming. These include Arabic classes and study of the Qur'an (Taleem) held three times per week for one hour, and Jummah (prayer). He indicates he is also learning about the Jewish faith as he has had thoughts of converting. Classes on Judaism are held twice per week for an hour. In addition to those classes, he states that he attends a Spanish devotional class, as he speaks Spanish. He does not indicate which religious faith provides the Spanish devotional. ECF No. 1 at PageID #: 17.

By August 2022, prison officials had grown skeptical of Plaintiff's attendance at multiple religious services and classes. He does not indicate that they prevented him from attending all of these services and programs at this point but they began to examine his movements to any location more closely. He alleges that Lieutenant Brock began stopping him in the hallway, asking to see his pass, and questioning him about where he was going. On a few occasions

2

(4:23cv2259)

which he does not specify, he was walked to restricted housing for a "time out."[1] ECF No. 1 at PageID #: 17.

Plaintiff contends he was stopped once again by Lieutenant Brock on November 28, 2022. He states she asked to see his pass. When she attempted to return the pass to him, Plaintiff admits that he "snatched it out of her hand." ECF No. 1 at PageID #: 17. He alleges that Lieutenant Brock placed him in handcuffs and walked him to segregation where he stayed in "time out" from 8:30 a.m. to 11:30 a.m. He returned to his cell shortly after his release from "time out," and discovered that his brother was packing his property to go to limited privileges housing ("LPH"). Plaintiff contends that he became depressed at this news and "consumed alcoholic beverages and smoked mind altering substances." ECF No. 1 at PageID #: 17. Around 4:00 p.m., he received a conduct report for acting in a sexually inappropriate manner towards Corrections Officer Ms. Phillips. He admits he also behaved in a sexually inappropriate manner towards the Mental Health Liaison Ms. Darkangelo. ECF No. 1 at PageID #: 17. For the second time that day, Plaintiff was placed in the "time out" cell. He was then moved to suicide watch. He states Ms. Phillips did not deliver a meal try to him. He alleges he then covered the window to his cell, preventing officers from seeing into the cell. Staff brought in a negotiator and Plaintiff removed the window covering. He indicates he was transferred to LPH at some point in the first week of December 2022 and his passes to religious services were discontinued. ECF No. 1 at PageID #: 17.

---

[1] Plaintiff describes a "time out" as being locked in a 3 ft by 3 ft barred cell in segregation.

(4:23cv2259)

Plaintiff alleges he received another conduct report on November 28, 2022. That one was issued by Lieutenant Brock for grabbing her hand. ECF No. 1 at PageID #: 17–18. This appears to be a different incident than the incident in which he "snatched" his pass from her hand, but it is unclear if the two incidents are related. He was found guilty of the conduct infraction and sentenced to thirty days in LPH. He indicates he began to serve that sanction around December 8, 2022. He claims all of his passes, including those for religious services and classes were discontinued while he was in LPH. ECF No. 1 at PageID #: 18.

Plaintiff alleges he sent kites and grievances to the warden's office, the unit management chief, and the deputy warden of special services to complain about the discontinuation of his passes. Plaintiff was informed that inmates in LPH are permitted to attend their declared religion's worship services. The services are held at special times. LPH inmates must sit away from the general population inmates. LPH imates are not allowed to attend any other services or programming. ECF No. 1 at PageID #: 19. He indicated that, on December 16 and 19, he complained that he had been denied passes to Taleem and Jummah on the previous Friday. He was advised to follow up with the Chaplain and was reminded that he was permitted to attend religious worship services only for his declared religion. ECF No. 1 at PageID #: 19.

On December 20, 2022, Plaintiff obtained a pass to attend Chapel/Bible/ Hebrew Armstrong Bible study. He was stopped and informed him that per LPH rules, he was not permitted to attend these types of classes. He was instructed to return to his cell but refused. Corrections Officer Fusillo attempted to place hand restraints on Plaintiff and he resisted. He was charged with a conduct violation. ECF No. 1 at PageID #: 19. On December 28, 2022,

4

(4:23cv2259)

Plaintiff obtained a pass to attend the Spanish devotional class. He was informed that he was not permitted to attend this class as an LPH inmate and was charged with a conduct violation for being out of place. He claims he was unable to attend any religious services the following week. ECF No. 1 at PageID #: 19.

Plaintiff then began to accumulate a series of conduct reports. On December 31, 2022, he received a conduct report from Corrections Officer Phillips for threatening her. She claimed Plaintiff mumbled under his breath as she walked by, "I'm gonna get you. I just don't know how yet. Maybe in the cell, but then your man down will go off." ECF No. 1 at PageID #: 19–20. Ms. Phillips was able to capture part of that interaction on her body camera. When questioned, Plaintiff claimed he was talking to someone else. ECF No. 1 at PageID #: 20.

On January 1, 2023, Plaintiff received another conduct report for threatening Officer Phillips. She claimed that Plaintiff yelled out of his cell window at her that he had "fantasies about it happening. Its either going to be in the shower or my cell. I'm gonna f*** you so hard in your a**." ECF No. 1 at PageID #: 20. He claimed that numerous inmates call out from their windows daily and Officer Phillips singled him out as the source of the message. ECF No. 1 at PageID #: 20.

On January 26, 2023, he received a conduct report from Corrections Officers Phillips and Timberlake for performing a sexual act in the shower. Plaintiff contends that the door was fully closed. ECF No. 1 at PageID #: 20. Two other officers were called to the housing unit to escort Plaintiff to segregation. The officers found Plaintiff sitting on the ping pong table and directed him to "cuff up." He refused. Instead, he got off of the table and started to walk away from the

5

(4:23cv2259)

officers. The officers continued to issue directives to stop and "cuff up." He demanded to see a supervisor. He was informed that he could speak with Lieutenant Kowal. Kowal, then, heard the commotion and came out of her office to assist. After Plaintiff refused to adhere to any of the directives, Lieutenant Kowal sprayed Plaintiff with pepper spray. Plaintiff grabbed his shirt from the table and walked toward a cell. The officers attempted to restrain him and he resisted. Officer Philips sprayed him a second time with pepper spray but this was not effective in subduing Plaintiff. He was eventually brought down using an arm bar and escorted to segregation. ECF No. 1-19 at PageID #: 108.

Later that same day, Corrections Officer Reghetti packed up Plaintiff's personal belongs from his cell. Multiple items could not fit within the 2.4 box or were altered. Plaintiff contends that electronics, state issued clothing an religious materials are not part of the 2.4 box restriction. ECF No. 1-20 at PageID #: 109. He claims the Institutional Inspector granted his grievance and awarded him a replacement television on February 17, 2023. ECF No. 1 at PageID #: 20.

On February 23, 2023, Mental Health Liaison Ms. Darkangelo reported Plaintiff exhibited increasingly threatening behaviors toward her after he was found guilty of the November 28, 2022 conduct report. She stated that Plaintiff had the opportunity to attend group sessions on Thursday afternoon in the mental health department. He was asked to leave the mental health department several times and referred to her as the "woman who abandoned me." ECF No. 1-23 at PageID #: 112. On another date he was asked to leave because there was no corrections officer present. She indicated that Plaintiff rose slowly and left begrudgingly making statements under his breath that "it ain't all that. Don't nobody even want you like that." ECF No. 1-23 at PageID

6

(4:23cv2259)

#: 112. On February 23, 2023, Plaintiff entered the mental health department, turned the door handle to Ms. Darkangelo's office, made eye contact with her, and laughed on his way to the metal detector to attend the group session. Darkangelo ordered him to return to his cell block immediately and told him she would be writing a conduct ticket. He refused the order and argued with the officer on post. He then left the department. Ms. Darkangelo expressed that "[h]is increasing boldness in attempts to engage this MHL are disturbing, unsettling, and point to an increase in entitlement that presents as unsafe to me." ECF No. 1-23 at PageID #: 112.

Lieutenant Brock also complained that Plaintiff was exhibiting increasingly aggressive behavior toward her. On June 14, 2023, Lieutenant Brock was in the center section of 15 east. This section is separated by a door from the section in which Plaintiff was housed. Maintenance opened the door between the two areas and Plaintiff discovered Brock was in the center section. He approached the center section and stood in the doorway so that it could not close. He asked if she had called his name. She told him she had not and asked him to leave the center section. He argued that he was not in the center section, while standing in the doorway and preventing the door from closing. Brock reported that Plaintiff continues to yell things at her from his cell, such as "hey sexy mama." ECF No. 1-29 at PageID #: 121. She claims Plaintiff sent her a kite stating, "You continue to poke a bear and then pour honey all over yourself. Stop interfering with my time!" ECF No. 1-29 at PageID #: 121. She contends he wrote a kite to her insinuating that he was her secret admirer. She claimed he addressed a kite to her using her first name and her maiden name. She claimed he continuously walked very close to her on purpose, and came to her office unannounced and uninvited, wiggled her door handled and then smiled at her just to

7

(4:23cv2259)

make her acknowledge him. ECF No. 1-29 at PageID #: 121. She issued a conduct report to him on June 14, 2023 for having non-consensual sexual conduct with her by intimidation other than threat or force or any other act knowingly done which constitutes a threat to the security of the institution, staff, or inmates. ECF No. 1-29 at PageID #: 121.

Plaintiff claims he attempted suicide by cutting his wrists on July 13, 2023. He was placed on constant suicide watch. On July 14, 2023, Mental Health Liaison Harris came to assess him. ECF No. 1 at PageID #: 22. Harris reported that Plaintiff had said he would remain on constant watch and continue self harm unless he was moved to 14 west to be with his brother, or was moved to another institution. Harris determined Plaintiff was not actually suicidal but instead was using threats of suicide as extortion. He issued a conduct report to Plaintiff. ECF No. 1-35 at PageID #: 127. Plaintiff states that Dr. Coe took him off of constant watch on July 28, 2023, but alleges Plaintiff did not engage with Dr. Coe during the assessment. He claims that after Dr. Coe left, he sliced his wrist with a razor blade. He claims he was taken from the suicide watch to the "time out" cell. He was then returned to constant watch. He claims Darkangelo came to assess him on suicide watch on July 29, 2023. He claims she did not assess him. ECF No. 1 at PageID #: 22. Plaintiff was transferred to ToCI on August 8, 2023. ECF No. 1 at PageID #: 23.

Plaintiff asserts four claims for relief. First, he claims he has a right under the First Amendment to practice all religions he chooses to practice, an his placement in segregation should not affect his ability to attend all of the religious services and classes he chooses to attend. Second, he claims prison officials limited his access to religious services in retaliation for

8

(4:23cv2259)

behaving in sexually inappropriate manner toward female officers. Third, he claims prison officials harassed him by repeatedly charging him with conduct infractions. Finally, he asserts a claim under RLUIPA. He contends that refusing to allow him to attend all of the religious services of his choosing was not the least restrictive method of implementing the rules of segregation. He seeks monetary damages.

## II. Standard for Dismissal

Although *pro se* pleadings are liberally construed, Boag v. MacDougall, 454 U.S. 364, 365 (1982) (per curiam); Haines v. Kerner, 404 U.S. 519, 520 (1972), the Court is required to dismiss an *in forma pauperis* action under 28 U.S.C. § 1915(e) if it fails to state a claim upon which relief can be granted, or if it lacks an arguable basis in law or fact. Neitzke v. Williams, 490 U.S. 319 (1989); Lawler v. Marshall, 898 F.2d 1196 (6th Cir. 1990); Sistrunk v. City of Strongsville, 99 F.3d 194, 197 (6th Cir. 1996). A claim lacks an arguable basis in law or fact when it is premised on an indisputably meritless legal theory or when the factual contentions are clearly baseless. Neitzke, 490 U.S. at 327.

A cause of action fails to state a claim upon which relief may be granted when it lacks "plausibility in [the] complaint." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007). A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Ashcroft v. Iqbal, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). The factual allegations in the pleading must be sufficient to raise the right to relief above the speculative level on the assumption that all the allegations in the complaint are true.

9

(4:23cv2259)

*Bell Atl. Corp.*, 550 U.S. at 555. The Plaintiff is not required to include detailed factual allegations, but must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading that offers legal conclusions or a simple recitation of the elements of a cause of action will not meet this pleading standard. *Id.* In reviewing a complaint, a court must construe the pleading in the light most favorable to the plaintiff. *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 561 (6th Cir.1998).

### III. Law and Analysis

As an initial matter, Plaintiff does not allege any facts or assert any legal claims pertaining to Annette Chambers-Smith. Plaintiff cannot establish the liability of any Defendant absent a clear showing that the Defendant was personally involved in the activities which form the basis of the alleged unconstitutional behavior. *Rizzo v. Goode*, 423 U.S. 362, 371 (1976); *Mullins v. Hainesworth*, No. 95-3186, 1995 WL 559381 (6th Cir. Sept. 20, 1995). Chambers-Smith is listed as a Defendant in the case caption, but there is no mention of her in any other part of the pleading. The Complaint simply does not reasonably associate Chambers-Smith to any of the claims set forth by Plaintiff.

Similarly, Plaintiff alleges that Chaplain Kosenko, Deputy Warden B. Evans, Warden Assistant G. Booth, Unit Manager Chief Melissa Spatny, Unit Manager S. Smallwood, Deputy Warden Theodore Jackson, and Institutional Inspector Felepa Lowry were indirectly involved in the alleged constitutional violations because they did not respond to his grievances and kites in a manner he considered to be favorable. Responding to a grievance or otherwise participating in

10

(4:23cv2259)

the grievance procedure, however, is insufficient to trigger liability under 42 U.S.C. § 1983. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). Plaintiff failed to state a claim against these Defendants.

In addition, Plaintiff claims Defendants would not allow him to attend all of the religious services of his choosing, in violation of the First Amendment and the RLUIPA. To establish a First Amendment free exercise of religion claim, Plaintiff must make a threshold showing that: (1) that the "belief or practice asserted is religious in [his] own scheme of things"; (2) that the belief or practice is "sincerely held"; and (3) that the Defendants' conduct infringed upon the belief or practice. *Kent v. Johnson*, 821 F.2d 1220, 1224 (6th Cir. 1987) (citations omitted). "[T]he constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large." *Shaw v. Murphy*, 532 U.S. 223, 229 (2001). In the First Amendment context, "some rights are simply inconsistent with the status of a prisoner or with the legitimate penological objectives of the corrections system." *Id.* (internal quotation and citation omitted). A prison regulation that impinges on an inmate's constitutional rights is "valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

Section 3 of the RLUIPA provides in part: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the burden furthers "a compelling governmental interest," and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)–(2). To state a claim under RLUIPA, the inmate must demonstrate that: (1) he seeks to exercise a "sincerely held religious belief;" and (2) the

11

(4:23cv2259)

government substantially burdened that religious exercise. The government then must show a compelling-interest and meet the least-restrictive-means test. *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 458 (6th Cir. 2019) (citations omitted).

Both the First Amendment and the RLUIPA require Plaintiff to demonstrate that the government placed a substantial burden on the practice of a sincerely held religious belief. Prior to his placement in LPH, prison officials permitted him to attend all religious programming of his declared faith as well as allowing him to attend worship services and classes for other religions to explore other faiths. When he was placed in the LPH, he was limited to attending worship services for his declared religion until he was back in the general population. Plaintiff was in LPH as a result of receiving more conduct reports for serious conduct violations. The restriction of his movement in the prison was temporary and was reasonably related to the penological objectives in place in LPH or segregation. Moreover, he fails to demonstrate that he had a sincerely held religious belief in attending all of these other services. He states he was curious about those faiths and wanted to learn more about them. Finally, while Plaintiff does allege that he was initially barred from attending any services when he was sent to LPH, he was assured he had the ability to attend Islamic services and was advised to follow up with the chaplain. It is not clear from his allegations that he was denied attendance at Islamic services after speaking with the chaplain. He fails to establish a violation of the First Amendment or RLUIPA.

Plaintiff's retaliation claims are wholly without merit. He claims prison officials limited his access to religious services in retaliation for behaving in sexually inappropriate manner toward female officers. Retaliation, though it is not expressly referred to in the Constitution, is

12

(4:23cv2259)

actionable because retaliatory actions may tend to chill an individual's exercise of First Amendment rights. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). To state a *prima facie* case for retaliation prohibited by the First Amendment, Plaintiff must establish: 1) he engaged in protected conduct; 2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and 3) that a causal connection exists between the first two elements. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). Behaving in a sexually inappropriate manner toward female corrections officers is not conduct protected by the First Amendment.

Finally, Plaintiff claims the officers harassed him by writing conduct reports. The Court liberally construes these claims as an attempt to assert claims under the Eighth Amendment. The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). The Eighth Amendment protects inmates by requiring that "prison officials . . . ensure that inmates receive adequate food, clothing, shelter, and medical care, and . . . 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). This, however, does not mandate that a prisoner be free from discomfort or inconvenience during his or her incarceration. *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). Prisoners cannot "expect the amenities, conveniences and services of a good hotel." *Harris v. Fleming,* 839 F.2d 1232, 1235 (7th Cir.1988); *see Thaddeus-X v. Blatter,* 175 F.3d 378, 405 (6th

13

(4:23cv2259)

Cir. 1999). In sum, the Eighth Amendment affords the constitutional minimum protection against conditions of confinement which constitute health threats, but does address those conditions which cause the prisoner to feel merely uncomfortable or which cause aggravation or annoyance. *Hudson*, 503 U.S. at 9–10 (requiring extreme or grave deprivation).

Harassment by corrections officers does not state an Eighth Amendment claim. *See Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987); *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987). Furthermore, the conduct reports were issued to Plaintiff for threatening female corrections officers with bodily harm, behaving in a menacing manner toward female officers, disobeying direct orders, and resisting attempts to place him in restraints. The Complaint, as written, suggests that the conduct reports were issued in response to Plaintiff's actions and not for the sole purpose of harassing him.

## IV. Conclusion

Accordingly, this action is dismissed pursuant to 28 U.S.C. § 1915(e). The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith.

IT IS SO ORDERED.

 March 14, 2024                    */s/    Benita Y. Pearson*
Date                               Benita Y. Pearson
                                   United States District Judge